## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Case No. 24-cv-XXXXX-XXX

TOMÁS NIEMBRO CONCHA,

      Plaintiff,

v.

NATALIA I. ZEQUEIRA DIAZ, in her official
capacity as Commissioner of the Office of the
Commissioner of Financial Institutions of
Puerto Rico

and

OFFICE OF THE COMMISIONER OF
FINANCIAL INSTITUTIONS OF
PUERTO RICO,

      Defendants.
_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Tomás Niembro Concha ("Niembro" or "Plaintiff") brings this action for

declaratory, injunctive, and other relief for ultra vires acts by the Office of the Commissioner of

Financial Institutions of Puerto Rico ("OCIF"), and OCIF Commissioner Natalia Zequeira Diaz

("Zequeira") (collectively "Defendants") in her official capacity, and for violations of the

Fourteenth Amendment and Eighth Amendment of the United States Constitution pursuant to 42

U.S.C. § 1983.

## INTRODUCTION

1.      OCIF, Puerto Rico's financial regulator, was created in 1985, by Puerto Rico's

legislature.

2.      In 1989, Puerto Rico's legislature authorized international banking in Puerto Rico for the stated purpose of expanding business and banking in Puerto Rico. Since then, OCIF has granted banking licenses to more than sixty international financial institutions.

3.      Niembro and Juan Ramírez Silva ("Ramírez") are shareholders of Nodus International Bank ("Nodus" or the "Bank"), an international banking institution that was granted a banking license in 2009 by OCIF.

4.      OCIF historically has been understaffed and overwhelmed, which OCIF Commissioner Zequeira blames on the proliferation of international banks. According to Zequeira, OCIF does not have sufficient resources to supervise both local Puerto Rico banks and international banks.

5.      In September 2022, OCIF lost its accreditation with The Conference of State Bank Supervisors because it was not complying with applicable regulations and lacked trained personnel.

6.      OCIF, led by Zequeira, decided to reduce the number of international banks in Puerto Rico by increasing fines and the number of forced liquidations and closures. As reported in the news, Zequeira was specifically targeting Venezuelan bankers.

7.       Niembro and Ramírez are Venezuelan bankers who are the sole shareholders of the Bank. In late 2023, OCIF ordered Nodus Bank liquidated, then placed an administrator and, subsequently, a receiver in charge of the Bank and that liquidation. During that same time period, Zequeira did not close or liquidate a single local Puerto Rico bank, and, in fact, granted a license to Puerto Rico's Nave Bank, whose Business Development Officer is Zequeira's husband.

8.      Multiplying this impropriety, on April 4, 2024, OCIF issued an order (the "Order"), purporting to pierce the Bank's corporate veil and hold Niembro and Ramírez

2

personally liable for the debts of the Bank (more than $86 million). The Order also purports to require Niembro and Ramírez to pay nearly $27,000,000 in personal restitution, as well as $50,000 in fines, and ban them from doing business in Puerto Rico's financial industry for 10 years.

9.      The Order was an unlawful ultra vires act because it exceeded the specific statutory authority granted to OCIF by the Puerto Rico legislature. That grant of authority does not permit OCIF to pierce a corporate veil, impose personal restitution, or ban bankers from Puerto Rico's financial industry. The Order also directly contravenes the legislature's stated intent to expand Puerto Rico's banking sector.

10.     OCIF also did not hold a hearing prior to issuing the Order—which violated the legislature's statute authorizing international banking in Puerto Rico, as well as procedural due process. Making matters worse, OCIF's regulations to challenge that Order are woefully insufficient and do not comport with what is required for procedural due process.

11.     Zequeira has publicly acknowledged that the Order was "extraordinary," that it was the first such order OCIF ever issued, and that she expected it to be challenged in court.

12.     Further, OCIF's stated basis for issuing this "extraordinary" Order is false. The Order states that Niembro and Ramírez committed fraud and stripped the Bank of its liquidity. This is patently untrue. In fact, Niembro provided four million dollars ($4,000,000) in personal funds to increase the Bank's liquidity. He and Ramírez also made three specific proposals for repaying depositors. OCIF accepted the first plan, but then Zequeira changed her mind after Niembro and Ramírez had spent months obtaining consent from the Bank's depositors. The other proposals were outright rejected or ignored by OCIF.

13.     Niembro brings this action to (1) declare that the OCIF Order exceeded OCIF's statutory authority, was an unlawful and invalid ultra vires act that also violated the Fourteenth Amendment and Eighth Amendment to the U.S. Constitution, and (2) enjoin OCIF and Zequeira from attempting to enforce the OCIF Order.

## THE PARTIES

### A. Plaintiff

14.     Plaintiff Tomás Niembro Concha owns the majority of shares in the Bank—an international bank headquartered in Puerto Rico. Niembro was appointed President of the Bank in June of 2018.

15.     Niembro is of Venezuelan national origin and resides in Caracas, Venezuela.

### B. Defendants

16.     Defendant OCIF is a Puerto Rico regulatory entity responsible for supervising and overseeing financial and banking entities organized under the laws of Puerto Rico. OCIF is domiciled in San Juan, Puerto Rico.

17.     Defendant Natalia Zequeira Diaz is the Commissioner of OCIF and is domiciled in Guaynabo, Puerto Rico.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

19.     Plaintiff asserts constitutional, Fourteenth Amendment, and Eighth Amendment violations that arise under 42 U.S.C. § 1983. Thus, the Court also has jurisdiction under 28 U.S.C. § 1343.

4

20.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332. Complete diversity exists because Niembro is a citizen of Venezuela, while Defendants are citizens of Puerto Rico. Additionally, the amount in controversy exceeds $75,000.

21.     Venue is proper in this district under 28 U.S.C. § 1391, which provides for venue in a "judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Defendants maintain their principal place of business in this district.

## BACKGROUND AND FACTS

### A.  OCIF's Founding Documents and Stated Purpose

22.     OCIF is Puerto Rico's financial regulator. Per its founding documents, it was created to safeguard the interests of bank shareholders and depositors. *See* Law No. 4 of October 11, 1985, Statement of Motives (emphasis added) ("The State cannot set aside its responsibility to ensure that the interests of those who are tied to these industries, be they ***depositors, creditors, shareholders*** or other types of associates, are protected.").

23.     OCIF acknowledges this on its website, where it declares that its vision is to "[p]romote an agile, modern and flexible public financial policy that ensures ***balance and equity between the interests of depositors, shareholders***, investors and user of financial services."[1]

24.     International banking is one of the activities that OCIF supervises. In the statutes governing OCIF and international banks, the Puerto Rico legislature specified that it was opening Puerto Rico to international banking to expand banking and business in Puerto Rico and to increase employment opportunities for Puerto Rican citizens. Specifically, the legislature stated:

---

[1] *About Us*, OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCERIAS, *https://www.ocif.pr.gov/sobre-nosotros* (emphasis added) (last visited May 8, 2024). *See* Exhibit A (English translated excerpts).

The new Act **significantly increases the number of persons and entities that may participate** and the scope of the business activities that may be undertaken. It also increases the economic incentives to make it more attractive and consolidates in **one legislative bill all the rights and obligations which affect the international banking entities**, including, specifically, all tax provisions.

Explicitly individuals and entities from the United States are permitted to participate in the business activities of the international banking entities; new financial activities are permitted to such entities; their organization is made more flexible and the distribution of dividends and profits to foreign persons and entities is exempted from taxation.

This Act is intended **to expand the potential market for Puerto Rico's international banking center** and will significantly enhance the knowledge and promotion of Puerto Rico through the world's financial community.

The principal benefits of an international banking center in Puerto Rico are the expansion of the service sector, the direct and indirect creation of jobs and the increase of the island's economic activity.

Puerto Rico offers many favorable conditions for carrying out international banking transactions, such as its political stability, the soundness of its banking system, the close economic ties with the United States, the high degree of professionalism, bilingualism and technical capacity of its human resources, a unified monetary market and system, its privileged geographical location, and a well-developed communications network.

**In order to comply with the purposes stated herein, this Act provides for the establishment of international banking entities under the supervision and regulation of the Commissioner of Financial Institutions.**

Law No. 52 of August 11, 1989, Statement of Motives (emphasis added). *See* Exhibit B (English translated excerpts).

### B. OCIF is Under Pressure: it is Understaffed and Overwhelmed, and has Lost its Banking Supervisor Accreditation

25. Despite being charged with regulating Puerto Rico's financial industry, OCIF is woefully understaffed. OCIF Commissioner Zequeira repeatedly has complained that it lacks the resources to do its job. According to news outlet Centro de Periodismo Investigative's report:

OCIF Commissioner Natalia Zequeira **acknowledged that her office lacked the necessary resources and budget to fully carry out its responsibilities.** For example, the OCIF **had only eight examiners and technology systems from the 1990s to oversee almost 85 financial institutions** that manage more than $136 billion in assets in Puerto Rico, according to OCIF data.[2]

26.    The U.S. Treasury Department has stated that OCIF has "severe resource constraints," and that "there are relatively few examiners and supervisory staff assigned to supervise a considerably large amount of [Puerto Rican financial entities]."[3]

27.    Because of this lack of resources, OCIF lost its accreditation with The Conference of State Bank Supervisors ("CSBS") in 2022. Virtually all[4] U.S. bank regulators are accredited by CSBS, an entity that monitors the procedures and operations of state agencies that regulate financial institutions in the United States.

28.    In granting accreditation, CSBS conducts an in-depth review of a regulator's policies, procedures and operations to determine if it meets the standards for (1) administration and finance, (2) personnel and training, (3) bank examination policies and procedures, (4) bank examination capabilities, and (5) bank supervision and legislation.[5] OCIF's loss of CSBS accreditation signals serious deficiencies in these categories.

---

[2] Luis J Valentín Ortiz, *Office of the Commissioner of Financial Institutions Loses Accreditation*, CENTRO DE PERIODISMO INVESTIGATIVO (Dec. 1, 2022, 3:56 PM) (emphasis added) *https://periodismoinvestigativo.com/2022/12/office-of-the-commissioner-of-financial-institutions-loses-accreditation/*.

[3] DEP'T OF TREASURY, NATIONAL MONEY LAUNDERING RISK ASSESSMENT at 69 (Feb. 2022), *https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-Risk-Assessment.pdf.*

[4] *Accredited States Bank, Mortgage & MSB as of February 17, 2023*, CONFERENCE OF STATE BANK SUPERVISORS, *https://www.csbs.org/sites/default/files/2023-02/Accredited%20State%20Departments%20as%20of%202.17.23.pdf* (last visited May 8, 2024) (showing that the regulators in 46 U.S. states are accredited by CSBS).

[5] *Accreditation Handbook for State Agencies*, CONFERENCE OF STATE BANK SUPERVISORS (Jan. 24, 2023), *https://user-9y4mjaj.cld.bz/Accreditation-Handbook*.

29.    OCIF initially attempted to keep its loss of CSBS accreditation "under wraps,"[6] but the Puerto Rico public became aware of OCIF's systematic failures, resulting in wide-spread public criticism of the agency and its management.[7]

30.    The San Juan Star, one of Puerto Rico's leading English-language news sources, cited OCIF's (admitted) institutional weaknesses as the reason for its loss of accreditation. The newspaper further reported that OCIF's shortcomings have led "to violations of consumer rights [and] non-compliance with applicable legislation," stating:

> As the OCIF itself acknowledges, ***deficiencies in its examination program of financial institutions caused the loss of accreditation before the CSBS***. The severe budget reduction, the lack of trained personnel, and the reduction of its financial education program, demonstrate the government's unwillingness to allocate resources to strengthen the agency.
>
> * * *
>
> Many times, OCIF has taken refuge in the fact that the examinations and bank control processes are confidential. These are excuses [to avoid] having to release information about non-compliance . . . . This is not acceptable, even less so when serious accusations against banks have plagued the last few months. ***Half-hearted control, insufficient personnel to deal with complaints, poor management of examination processes, among other failures, result in violations of consumer rights, non-compliance with applicable legislation, and other practices that directly affect the financial health of people who live in Puerto Rico.***

THE SAN JUAN DAILY STAR, Dec. 6, 2022, at 5; *see* note 6 (emphasis added), *supra*.

---

[6] The Star Staff, *Ayuda Legal: OCIF's Loss of Accreditation not to 'be Taken Lightly'*, THE SAN JUAN DAILY STAR, Dec. 6, 2022, at 5, *https://issuu.com/thesanjuandailystar/docs/dec-6-22*.

[7] Alejandro Morales, *Puerto Rico's Financial Meltdown: Natalia Zequeira's Controversial Reign and the Nodus International Bank Crisis*, SAN JUAN NEWS DAILY (Jan. 26, 2024), *https://sanjuannewsdaily.com/Business/Natalia-Zequeiras-Controversial-Reign-and-the-Nodus-International-Bank-Crisis*; Ana Lopez, *Puerto Rico's Financial Meltdown: Natalia Zequeira's Controversial Reign and the Nodus International Bank Crisis*, PUERTO RICO BIZHUB (Feb. 2, 2024), *https://puertoricobizhub.com/natalia-zequeiras-controversial-reign-at-ocif-and-the-nodus-international-bank-crisis*; Carmen Diaz, *Puerto Rico's Financial Meltdown: Natalia Zequeira's Controversial Reign and the Nodus International Bank Crisis*, RICA MAGAZINE (Feb. 3, 2024), *https://ricanmagazine.com/politics/Puerto-Ricos-Financial-Meltdown-Natalia-Zequeiras-Alleged-Misconduct-and-Its-Consequences*.

31.     OCIF's loss of accreditation is significant. As a financial regulator, one of its primary tasks is to inspect financial institutions to determine the adequacy of their internal finances, management, personnel, policies and procedures[8]—criteria OCIF failed to satisfy. OCIF's failure in those areas naturally undermines confidence in its ability to properly supervise banking in Puerto Rico.

### C.  OCIF Blames its Woes on International Banks, and Engages in a Campaign of Targeted Discrimination Against Foreign-Owned Banks

32.     Zequeira has publicly blamed OCIFs' inability to do its job on the international banking that was expressly sought and authorized by Puerto Rico's legislature.[9] According to Zequeira, "[w]hile my examiners are with the FDIC looking at First Bank or Banco Popular with the Federal Reserve, at the same time they are running parallel on four or five examinations of international institutions."[10] To deflect attention from herself and OCIF, Zequeira stated that "bank regulators in Puerto Rico are getting a lot of questions from federal regulators about these foreign banks operating in Puerto Rico."[11]

33.     To compensate for its staffing shortages and demonstrate that it was "serious" about regulating banks, OCIF has engaged in a targeted campaign of unconstitutional discrimination

---

[8] *CAMELS Rating System*, THE FED. REG. (2021), *https://www.federalregister.gov/d/2021-01396* ("The current CAMEL rating is based upon an evaluation of five critical elements of a credit union's operations: Capital adequacy, asset quality, management, earnings, and liquidity and asset-liability management.").

[9] Luis J. Valentín Ortiz, *Small International Banks in Puerto Rico Appear in the Pandora Papers*, CENTRO DE PERIODISMO INVESTIGATIVO (Oct. 5, 2021), *https://periodismoinvestigativo.com/2021/10/pequenos-bancos-internacionales-de-puerto-rico-se-asoman-en-los-pandora-papers/*. *See* Exhibit C (English translated excerpts).

[10] *Id.*

[11] Frances Robles, *Peter Schiff Has a Deal With Puerto Rico to Liquidate His Euro Pacific Bank, He Says*, THE NEW YORK TIMES (Aug. 14, 2022), *https://www.nytimes.com/2022/08/09/business/euro-pacific-peter-schiff.html?auth=login-google1tap&login=google1tap*.

against foreign-owned international banks. "Prior to 2017, there is no evidence of a single sanction issued against any [International Financial Institution ("IFE")] in Puerto Rico. Since then, OCIF has imposed 63 fines totaling $439,400." [12]

34.     Further, in an obvious and unlawful effort to compensate for its inability to perform its core function of regulating international banking entities ("EBIs"), OCIF has resorted to discriminately expelling EBIs from Puerto Rico's financial industry altogether.

35.     As is widely reported in the news, OCIF "crack[ed] down on international banks," closing eight (8) international banks in the two years from 2021 to 2023:

> (1) Euro Pacific Bank, closed in October 2021;
> (2) AndCapital, closed in November 2021;
> (3) Hamilton International Bank, closed on January 9, 2022;
> (4) First Finance, closed on June 30, 2022;
> (5) Bancrédito International Bank & Trust, closed on August 9, 2022;
> (6) Athena Bitcoin, license application denied on September 9, 2022;
> (7) Standard International Bank, LLC, issued a cease-and-desist order on April 24, 2023; and
> (8) Nodus International Bank, placed in liquidation on May 8, 2023.[13]

36.     Additionally, multiple news outlets have reported that OCIF has specifically targeted Venezuelan bankers in its crackdown.[14]

37.     At the same time, OCIF took no action against any locally owned banks, such as Banco Popular or First Bank—which according to Zequeira, OCIF did not have resources to supervise along with international banks.

---

[12] Luis J. Valentín Ortiz, *supra* note 9.

[13] Christian Reeves, *Puerto Rico Cracks Down on International Banks: A Look at the Recent Closures*, PREMIER BANKING CONSULTANCY (Apt. 24, 2023), *https://banklicense.pro/puerto-rico-cracks-down-on-international-banks-a-look-at-the-recent-closures/.* OCIF has also taken regulatory action against two additional international banks, IUBank and TBB International Bank.

[14] Ana Lopez; Carmen Diaz, *supra* note 7.

38.     This shocking policy of discrimination against international banking that was expressly authorized and invited by the legislature, was an unlawful method for Zequeira and OCIF to work around their purported lack of resources. Even more shocking was Zequeira's grant of a new banking license to Nave Bank in August 2023. Zequeira's husband, Héctor del Río, just so happens to serve as Nave Bank's Business Development Officer.

39.     Zequeira's licensure of her husband's online bank was highly unusual. It marked OCIF's first-ever licensure of a digitally focused local bank and was the "first application for a new bank on the island in over 20 years."[15]

40.     Defendants' motive and goal is obvious—suppress international banking but promote and expand local banking that will personally benefit OCIF Commissioner Zequeira.

41.     None of this shocking, self-serving conduct should come as a surprise to those familiar with OCIF, which has long been embroiled in scandal and is a pawn in political power struggles.[16] Zequeira's manner of "leadership" is highly controversial, and very likely was anticipated by Puerto Rico's senate, which opposed her selection as OCIF Commissioner.[17]

**D.  OCIF Targets Nodus Bank and Places it Into Receivership**

42.     Nodus was founded by Optivalores Investment Company Ltd. in 2009, and commenced operations in Puerto Rico in February of 2010. On May 2, 2017, Veninvest PR Corp and Canoma Corporation purchased 96% of shares in the Bank.

43.      Veninvest PR Corp is owned by Niembro, a Venezuelan national who is an economist and a well-known banker, having held executive positions at a number of high-profile

---

[15] *About Us*, NAVE BANK, *https://www.navebank.com/en/about-us* (last visited May 10, 2024).
[16] *Press Release: Former Governor of Puerto Rico Arrested in Bribery Scheme*, U.S. DEPARTMENT OF JUSTICE (Aug. 4, 2022), *https://www.justice.gov/opa/pr/former-governor-puerto-rico-arrested-bribery-scheme*.
[17] Carmen Diaz, *supra* note 7.

Latin-American financial institutions. Canoma Corporation is owned by Ramírez, who also is of Venezuelan origin, and himself has a lengthy career in the banking industry.

44.     On November 12, 2019, Niembro and Ramírez transferred the shares owned by Veninvest and Canoma to themselves personally, so that each owned 50% of shares in the Bank. Later, after a recapitalization effort, Niembro's ownership percentage increased, making him the majority shareholder.

45.     On January 18, 2022, OCIF commenced its fifth (and final) review of the Bank. Ten months later, on October 13, 2022, OCIF delivered the results of its examination, severely downgrading the Bank on each of the CAMELS criteria.

46.     On December 14, 2022, the Bank responded to OCIF's report of examination and stated how it planned to address OCIF's concerns. The Bank committed to raising additional capital, along with other measures related to its asset quality. It also engaged BDO to review its compliance area and provide an independent evaluation as to the appropriate score. All of this was for naught.

47.     On March 9, 2023, OCIF instructed the Bank that it must liquidate its operations—even though Niembro had injected $4,000,000 of personal funds to increase liquidity.

48.     On May 5, 2023, with no other tenable options, the Bank was forced to enter into a liquidation plan (the "Liquidation Plan") under OCIF's supervision. The Bank agreed to cease operations, liquidate its assets and return depositors' funds.

49.     Under the Liquidation Plan's provisions, the Bank was afforded a mere fifteen (15) days to propose a candidate to administer the Liquidation Plan. Otherwise, OCIF would appoint Driven Administrative Services LLC ("Driven") as the Bank's administrator.

50.     Not surprisingly, the Bank was unable to meet the unreasonably short, allotted time frame, and OCIF appointed Driven as administrator under the Liquidation Plan.

51.     OCIF's decision to appoint Driven as the administrator was highly suspect. Driven had been established only three years earlier, in 2021. Further, it did not appear to have the staff or resources needed to manage a bank administration and liquidation.  There were other more experienced administrators available for significantly lower fees.

52.     In fact, on May 25, 2023 (five days after OCIF's deadline), the Bank obtained a proposal from Lugo Mender Group, LLC ("Lugo"), for professional services as Liquidating Receiver.

53.     Lugo was founded in 1996 and had experience as a bank receiver in Puerto Rico. Lugo's estimated fees for serving as the Bank's administrator were less than half the fees proposed by Driven. But OCIF's unreasonable fifteen-day deadline had passed, and it already had appointed Driven as the Bank's administrator.

54.     It also was too late for BDO's report, which arrived on June 23, 2023, and determined that the Bank's compliance division should be ranked a "2", meaning that the Bank's compliance program "contains critical functions to detect and address money laundering and terrorist financing . . . ."

55.     On October 3, 2023, OCIF unilaterally, through a complaint and order, appointed Driven as the Bank's receiver.

56.     As will be shown below, OCIF's decision to make Driven the Bank's administrator and receiver—despite the availability of more qualified, less costly alternatives— began a cascading series of events by which Zequeira and OCIF committed unlawful, ultra vires acts to avoid responsibility and scapegoat Niembro and Ramírez.

E. **Driven is Unable to Satisfactorily Perform its Duties as Administrator and Liquidator, while OCIF Blocks Niembro's and Ramírez's Efforts to Repay the Bank's Depositors**

57.     OCIF's appointment of Driven as administrator and liquidator was the result of either corruption or gross negligence by defendants.

58.     First, OCIF's agreement structure with Driven did nothing to promote the efficient advancement of the Liquidation Plan. Driven's proposal for services as administrator and liquidator provided for it to be paid an hourly fee, which provided no incentive to collect funds owed to the Bank, but instead provided an open-ended incentive to drag out the process.

59.     Further, on Driven's watch, there was a large-scale exodus of experienced and seasoned Bank employees, including key officers, such as the Bank's credit officer. The number of Bank employees declined from approximately forty-five before Driven's appointment, to less than ten today.

60.     Naturally, this loss of key personnel hindered Driven's ability to collect on loans and repay depositors under the Liquidation Plan. On information and belief, Driven has repaid only *five* depositors[18]—despite being in charge of Nodus for nearly a year since its appointment as administrator on June 5, 2023.

61.     In furtherance of defendants' campaign to destroy the Bank and unlawfully scapegoat (and impoverish) Niembro and Ramírez, Driven and Zequeira repeatedly rejected plaintiff's efforts to aid in the Bank's liquidation and return funds to depositors. First, Niembro and Ramírez proposed a plan whereby the Bank's outstanding deposits exceeding $20,000, together with corresponding loans, would be transferred to Nodus Finance or AlterBank Limited ("Alter Bank"), which would assume the duty of collecting on the loans and repaying depositors.

---

[18] Further, those "payments" were nominal amounts made solely to confirm that Driven had the technological ability to make payments.

Those institutions also would simultaneously enter into an agreement with depositors to migrate their funds and convert their deposits into notes that would be payable in three years.

62.     This plan also provided that deposits of less than $20,000 would be directly repaid by the Bank using the liquid funds it had at hand.

63.     Driven and Zequeira initially agreed to this plan, and Zequeira spoke widely about it.[19] Niembro and Ramírez expended great effort to contact Bank depositors to obtain their consent. By the end of 2023, Niembro and Ramírez had received written consent from forty-two depositors to migrate their deposits to Alter Bank and from 419 depositors to migrate their loans to Nodus Finance. Only 149 depositors opted to remain with the Bank.

64.     Then, in late January 2024, Driven abruptly informed Niembro and Ramírez that it would not be proceeding with the plan to migrate the loans, that Zequeira was no longer interested in migrating the deposits, and that she instead wanted a compulsory liquidation of all the Bank's assets.

65.     Unwilling to give up, Niembro and Ramírez scrambled to put together an alternate plan. They proposed that Nodus Finance would assume the burden of collecting the Bank's loans, in exchange for a monthly fee and a commission on amounts collected on the loans. Unlike OCIF's hourly arrangement with Driven, this plan would incentivize Nodus Finance to actually collect the amounts owed. Its commission was projected to be covered by the interest on the loans it would be collecting.

66.     This plan also would mitigate one of the issues facing Driven, that the Bank's key personnel were gone, which hampered collection efforts. Pursuant to this proposal, Nodus

---

[19] Efraín Montalbán Ríos, *Owners of Nodus Bank Must Return Almost $27 Million to Clients*, EL NUEVO DIA (Feb. 25, 2024), *https://www.pressreader.com/puerto-rico/el-nuevo-dia1/20240225/282029037166692*. *See* Exhibit D (English translated excerpts).

Finance would send experienced personnel to Venezuela for at least six months to collect on the loans (many of which were made to Venezuelans). Nodus Finance also would use its superior knowledge of the Bank's clients, their financial positions, their assets, and the Venezuelan legal system, to collect on the loans. Zequeira summarily rejected this proposal.

67.     Undeterred, Niembro and Ramírez sent a third proposal on April 3, 2024. The proposal laid out a plan whereby depositors would be paid a substantial amount of their deposits. OCIF never substantively responded to that proposal. Instead, as will be further shown in the following section, OCIF issued its draconian, unlawful Order the very next day.

### F.  Facing Mounting Public Pressure to Return Depositors' Money, OCIF Hatches a Plan to Make Niembro and Ramírez Pay for its Own Misconduct

68.     By April 2024, on information and belief, neither OCIF nor Driven had collected substantial debts owed to the Bank, nor had they paid back more than five depositors. There also was no clear path forward for them to do so—especially after repeatedly rebuffing the assistance offered by Niembro and Ramírez.

69.     Public pressure was mounting for OCIF to repay depositors' funds. The news and media were awash with articles criticizing OCIF's handling of the Bank's receivership. For example, The News Journal reported that "[f]aced with complaints, the OCIF Commissioner, Natalia Zequeira, acknowledged that the lack of communication has caused misinformation among clients."[20]

70.     In an attempt to mitigate rising public concern resulting from OCIF's war on the Bank, Zequeira claimed that "OCIF [was] doing its best to expedite this process and be able to

---

[20] Stephanie L. López, *Clients Claim Disbursement of Their Deposits in Nodus Bank*, THE NEWS JOURNAL (Jun. 23, 2023, updated Jan. 26, 2024), https://www.theweeklyjournal.com/top-stories/clients-claim-disbursement-of-their-deposits-in-nodus-bank/article_ae24756e-11e8-11ee-a75c-4be8a9ffe9ad.html.

provide answers and return the money as soon as possible within the bank's liquidation process."[21]
More than 320 depositors had filed complaints with OCIF demanding the return of their funds.

71.     To deal with its public relations nightmare, and blame others for its own
misconduct and incompetence, OCIF hatched an unlawful plan to shift all liability to Niembro
and Ramírez. As an added "bonus," OCIF also hoped to use this plan to improve its sorry
reputation as a bank regulator. As will be shown below, OCIF is as inept at scheming as it is at
regulating banks.

72.     On April 4, 2024, OCIF filed a Complaint and Order to Pierce the Corporate Veil
of Nodus Bank (the "Order"). In the Order, OCIF accuses Niembro and Ramírez of having
misused the Bank's assets and stripped the Bank of its liquidity (all of which is damnably false).

73.      As a penalty, the Order purports to "lift" the Bank's corporate veil and make
Niembro and Ramírez personally liable for all the Bank's debts, while it orders them to pay
$26,825,189.48 in purported restitution, fines each of them $25,000, and prohibits them from
doing business in the financial industry in Puerto Rico for ten years, as follows:

> (i)      The corporate veil is lifted on Nodus International Bank,
> Inc.;
>
> (ii)     By engaging in the conduct described above, Mr. Niembro
> and Mr. Ramírez violated Law No. 4-1985 and Law No. 52-1989;
>
> (iii)     Mr. Niembro and Mr. Ramírez are **ORDERED**, under the
> strictest warning of severe penalties, to be jointly and severally
> liable with Nodus for all debts of IBE, in addition to personally and
> jointly and severally reimbursing the sum of not less than
> **$26,825,189.48**, providing that such sum shall be used to fulfill
> Nodus' obligations to its depositors and creditors;
>
> (iv)     Pursuant to Section 20(c) of Act No. 52-1989, both Mr.
> Niembro and Mr. Ramírez, under the strictest warning of severe
> penalties, are hereby **IMPOSED**, a fine of $25,000.00 each, for the

---

[21] *Id.*

17

distribution of $50,000.00 of dividends to preferred shareholders on April 17, 2023 without the prior authorization from OCIF; and

(v)    Mr. Niembro and Mr. Ramírez are **PROHIBITED** from conducting business in the Puerto Rico financial industry, directly or indirectly, for a period of ten (10) years.[22]

74.    After issuing the Order, Zequeira went on a press tour bragging about how tough she and OCIF were being on international banks—so tough that OCIF's actions were "extraordinary"—and predicting that its conduct would be litigated in the courts.[23] On *those points*, Zequeira was correct—and here we are.

### G.  OCIF's Order is Ultra Vires, Exceeds its Statutory Authority, and Violates the Fourteenth Amendment and Eighth Amendment to the U.S. Constitution

#### 1.  *OCIF's Order is Ultra Vires and Exceeds its Statutory Authority*

75.    OCIF is an administrative agency created by Puerto Rico's legislature in 1985. With regard to the conduct at issue in this action, OCIF derives its general authority from the *Office of the Commissioner of Financial Institutions Act*, Law No. 4 of October 11, 1985 ("Act No. 4-1985"), and its power to regulate international banks from the *International Banking Center Regulatory Act*, Law No. 52 of August 11, 1989 ("Act No. 52") (collectively, the "Acts").

76.    The Acts set forth in scrupulous detail the enumerated powers that the legislature granted to OCIF, along with the specific purposes for granting those powers. Any act by OCIF that exceeds its enumerated powers is ultra vires and void ab initio. *See, e.g., Ryan v. U.S.*

---

[22] *Oficina del Commisionado de Instuciones Financieras v. Nodus Int'l Bank, Inc.*, C24-D-003, Complaint and Order to Pierce the Corporate Veil of Nodus International Bank, Inc. and Impose Restitution. *See* Exhibit E (English translated excerpts).

[23] Efraín Montalbán Ríos, *Owners of Nodus Bank Must Return Almost $27 Million to Clients*, EL NUEVO DIA (Apr. 4, 2024, 6:30 PM), https://www.elnuevodia.com/negocios/banca-finanzas/notas/duenos-de-nodus-bank-deberan-restituir-casi-27-millones-a-clientes/ ("It is the first time that the OCIF takes an action of this type against a financial entity, commissioner Natalia Zequeria Díaz confirmed to El Nuevo Día . . . .  The commissioner was convinced that the bankers will oppose the action of the OCIF, so they are prepared to take the lawsuit to court."). *See* Exhibit F (English translated excerpts).

*Immigr. & Customs Enf't*, 974 F.3d 9, 19 (1st Cir. 2020) (citations omitted) ("When an agency acts in a manner not authorized by statute, its action is ultra vires . . . .").

77.    Specifically, both Acts contain a section entitled "Penalties," which states in clear terms the only penalties that OCIF is authorized to impose for specific violations. Most of those penalties are relatively minor—especially in comparison to the draconian penalties OCIF ordered in this case.

78.    For example, Act No. 4-1985 states that "any . . . person who violates the provisions of this Act or the regulations promulgated hereunder shall be subjected to an administrative fine . . . which in no case shall exceed five thousand (5,000) dollars," and that OCIF may impose daily fines of $5,000 for a continuing violation, but "in no case may the sum total of the fines exceed fifty thousand (50,000) dollars." Act No. 4-1985, Article 20 (a), (c). *See* Exhibit G (English translated excerpts).

79.    Similarly, Act No. 52-1989 states that OCIF is authorized to:

> (1)    Impose and collect administrative fines of not less than five thousand dollars ($5,000.00) nor more than twenty-five thousand dollars ($25,000.00) for each violation of the provisions of this Act or the provisions contained in the rules and regulations that may be promulgated hereunder;

> (2)    order restitution or reimbursement of payments received in violation of the provisions of this Act or any rule or regulation that may be promulgated hereunder, or such other remedy as she or he deems necessary to enforce the purposes of this Act; and

> (3)    impose and collect administrative fines of not less than one thousand dollars ($1,000.00) nor more than ten thousand dollars ($10,000.00) for each day in which the international banking entity fails to comply with the requirements or orders issued by the Commissioner.[24]

---

[24] Exhibit B, Section 20(e).

80.     Dispositively, *nowhere* do these Acts authorize OCIF to issue an order purporting to pierce a bank's corporate veil and make its shareholders responsible for its debts. Consequently, the OCIF Order is ultra vires and void ab initio.

81.     The Order also contradicts the legislature's intent in enacting Act No. 52-1989, "to expand the potential market for Puerto Rico's international banking center" and to "significantly enhance the knowledge and promotion of Puerto Rico through the world's financial community." Act No. 52-1989 further notes that "[t]he principal benefits of an international banking center in Puerto Rico are the expansion of the service sector, the direct and indirect creation of jobs and the increase of the island's economic activity." Exhibit B, Statement of Motives (emphasis added).

82.     An order by OCIF purporting to pierce an international bank's corporate veil and make its shareholders personally liable for the banks' debts plainly exceeds OCIF's enumerated powers. If permitted, this unlawful conduct also would have a profound chilling effect on international banking in Puerto Rico, by threatening all of the shareholders of international banks. Some would undoubtedly move their banks to other jurisdictions, while others would choose not to open international banks in Puerto Rico in the first place.

83.     This probably would suit OCIF just fine, because it might help alleviate its chronic understaffing. But it plainly contradicts and would undermine the legislative intent behind Act No. 52-1989, to expand international banking in Puerto Rico and with it, Puerto Rico's service sector, creating jobs as a result.

84.     The OCIF Order also contradicts its expressly stated mission in the statute that created it, which requires it to protect the interests of shareholders. *See* Exhibit G, Statement of Motives (emphasis added) ("The State cannot set aside its responsibility to ensure that the

interests of those who are tied to these industries, be they ***depositors, creditors, shareholders*** or other types of associates, are protected.").

85.     In like fashion, OCIF's Order purporting to require Niembro and Ramírez to "personally and severally restitute the sum of not less than $26,825,189.48" is ultra vires and void. Act No. 52-1989 authorizes OCIF only to "impose restitution or reimbursement of ***those payments received*** in contravention of the provisions of this Act or any rule or regulation." Exhibit B, Section 20(e)(2) (emphasis added).

86.     However, and as OCIF acknowledges in its Order, the Bank paid for the notes by cancelling $25,738,875.65 that Nodus Finance owed the Bank. Order at 3. That cancellation of debt was not a "payment" that one might "reimburse" under the statute, and there is no basis to order Niembro and Ramírez to make restitution of anything in their personal capacity, because they received nothing in that transaction.

87.     Likewise, the Order's attempt to prohibit Niembro and Ramírez "from doing business in the financial industry in Puerto Rico, directly or indirectly, for a period of ten (10) years" was ultra vires and void ab initio. Order at 33. No such sanction can be found in the penalties sections of the Acts.

88.     Further, the catchall language in Act No. 52-1989, Section 20(e)(2), permitting the Commissioner to impose a "remedy as she or he deems necessary to enforce the purposes of this Act" is unconstitutionally vague and does not provide plaintiff with notice as to what potential penalty may be imposed by OCIF.  And it certainly did not provide plaintiff with notice of the draconian and extraordinary penalties that OCIF imposed in this case.

89.     The fines that OCIF imposed are also wholly disproportionate and excessive, especially when compared to the other penalties in the statute. The total value of these fines,

penalties and disabilities exceeds $112,000,000, which is 4,480 times larger than the maximum

statutory fine of $25,000. The purported ten-year ban on doing business in Puerto Rico's

financial industry has an incalculable value that alone dwarfs the value of the maximum fine

under the Act.

90.     Finally, it was an unlawful, ultra vires act for OCIF to issue the Order without

first holding an administrative hearing, which is required by Act No. 52-1989, as the "Penalties"

section of the Act expressly states:

> ***If any director, official or individual*** acting in a similar capacity of
> an international banking entity or of a person of which the
> international banking entity is a unit, ***violates***, or voluntarily or
> negligently permits any director officer, agent, or employee of the
> international banking entity or of the person of which the
> international banking entity is a unit, to violate this Act, the
> Commissioner's regulations, circular letters or guidance documents
> applicable to EBIs, or any order issued by the Commissioner or
> memorandum of understanding entered into pursuant to this Act, or
> any provision of the Articles of Incorporation, Articles of
> Organization, Bylaws, Limited Liability Company Agreement,
> Partnership Agreement, or other document by which the banking
> entity is organized ***The Commissioner shall appoint and summon
> interested parties to an administrative hearing*** in accordance with
> the regulations provided in Section 23 of this Act. ***After the hearing
> and after the Commissioner determines that any provision of this
> subsection has been violated, the Commissioner shall take
> appropriate action, including suspension or removal of such
> director, officer or individual.*** [25]

91.     OCIF never held an administrative hearing before issuing its Order. In fact, the

first time Niembro and Ramírez became aware of OCIF's purported, *ex parte* sanctions Order

was when they received a copy of it by email on April 4, 2024. In other words, Niembro and

Ramírez never had an opportunity to confront their accuser, hear and see the purported evidence

against them, present witnesses, or defend against OCIF's outrageous accusations. As will be

---

[25] Exhibit B, Section 20(a) (emphasis added).

demonstrated below, OCIF's unlawful, ultra vires conduct also violated Niembro's and Ramírez'
due process rights.

###   2.   *OCIF's Order Violates Plaintiff's Procedural Due Process Rights Guaranteed by the Fourteenth Amendment*

92.   OCIF and Zequeira violated Niembro's and Ramírez's right to procedural due
process, because the Order purported to deprive them of property interests without a pre-
deprivation hearing. The most fundamental component of procedural due process is adequate
notice and a meaningful opportunity for a hearing before any deprivation of a significant
property interest may occur. *E.g., Aurelio v. Rhode Island Dept. of Admin., Div. of Motor
Vehicles*, 985 F. Supp. 48, 56 (D.R.I. 1997) (citations omitted).

93.   As demonstrated in section G(1), *supra*, Niembro and Ramírez were not given
any advance notice of the purported penalties, let alone an opportunity to challenge those
penalties, before the OCIF Order purported to impose them.

94.   OCIF's *ex parte* deprivation of plaintiff's significant property interests in his
personal funds, his right to work in Puerto Rico's financial industry and his right to the
protections of corporate law as a shareholder of the Bank, with no opportunity for a pre-
deprivation hearing, was a gross violation of plaintiff's procedural due process rights.

95.   Further, even if OCIF had held the required hearing before issuing its Order, such
a hearing would not have satisfied procedural due process. The amount of procedural due
process required is directly proportionate to the importance of the property interest at issue. *E.g.,
Lee v. State of R.I.*, 942 F. Supp. 750, 754-55 (D.R.I. 1996) ("[T]he processes required by the
[Due Process] Clause with respect to the termination of a protected interest will vary depending
upon the importance attached to the interest and the particular circumstances under which the

deprivation may occur.") (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985) (quotation marks omitted)).

96.     As demonstrated in section G(1), *supra*, the fines that OCIF is authorized to issue under the Acts are comparatively minor, ranging from $5,000 to $25,000 per violation. Unsurprisingly, the due process safeguards that govern the corresponding OCIF proceedings are also relatively minor.

97.     The regulations that govern administrative proceedings that are required before OCIF may issue relatively minor fines under the Acts are properly proportional to those fines. A defendant has only twenty days to answer the complaint and thirty days to conduct discovery, with the hearing scheduled thereafter. *See* OCIF Reg. No. 3920, Rule 4 (20 days to answer); OCIF Reg. No. 3920, Rule 8.4 (30-day discovery period); *see also* Exhibit H (English translated excerpts). Further, the regulations say nothing about how discovery is to be conducted, and the rules of evidence do not apply to the final hearing. *Id.*, OCIF Reg. 3920, Rules 8.1, 11.5.

98.      OCIF's procedural framework caters to a speedy resolution of disputes that could result in the minor fines permitted by the Acts. Such skimpy procedures and speedy resolutions are wholly improper where, as here, OCIF's Order imposes nearly $27,000,000 in purported personal restitution, saddles the Bank's shareholders with more than $86,000,000 of the Bank's debts, and bans plaintiff from doing business in the financial industry in Puerto Rico for ten years.

99.     Facing this absurdly short timeframe for an improper, post-hoc hearing in the OCIF's administrative proceeding, Niembro and Ramírez reasonably sought a 90-day extension from the OCIF examiner so they could attempt to prepare an adequate defense. But staying true

to form, that request was denied, and the OCIF examiner granted only 30 days.[26] This foreshortened extension plainly was insufficient, and, standing alone violated the due process clause of the Fourteenth Amendment.

### 3. To Top All of this Off, the Underlying Facts Recited by the Order are False and Unlawfully Damage the Reputations of Niembro and Ramírez

100.    The Order seeks to portray Niembro and Ramírez as scheming fraudsters who stripped the Bank of its liquidity for their own benefit, causing the Bank to fail. Order ¶ 82-98. Nothing could be further than the truth.

101.    The Bank's liquidity issues were caused by losing access to its master account with the Federal Reserve Bank of New York, which had begun cutting off small and international banks in Puerto Rico, as well as access to its accounts at correspondent banks, which also were being cut off by the Fed.[27] Without those accounts, the Bank's ability to send funds to, or receive funds from, other banks was severely limited.[28] This naturally impeded the Bank's ability to receive borrower funds to pay down loans, or send funds to pay back depositors.

---

[26] *Oficina del Commisionado de Instuciones Financieras v. Nodus Int'l Bank, Inc.*, C24-D-003, Order, Liftin of the Corporate Veil; Shareholder Liability; Restitution. *See* Exhibit I (English translated excerpts).

[27] On May 31, 2022, the Bank lost access to its account with the Federal Reserve Bank of New York. On July 15, 2022, it lost access to an account at its primary correspondent bank, Solcoop (which the Federal Reserve also had cut off). And on October 19, 2022, the Bank lost access to its account with Signature Bank (which stopped offering those services to Puerto Rico international banks due to issues it was having with the FDIC). By the time the Bank was placed in liquidation, only its correspondent account at Euro Exchange remained.

[28] The Bank's setup with the Federal Reserve Bank of New York was manual. Transfers could only be made over the phone and were limited to three transfers per hour, with a daily capacity of 24 transfers. The Bank used the correspondent banks to increase that capacity.

102.     Then, in October of 2022, MasterCard canceled its agreement with the Bank, based on supposed violations of sanctions against Venezuela in 2016 by the Bank's prior owners and administration, which rendered the Banks's credit cards and debit cards useless.

103.     This spooked depositors, who demanded the return of their deposits. Between May and November 2022, the Bank returned more than $90,000,000 dollars to its depositors, more than 45% of its total deposits.

104.     Nonetheless, the Bank set about raising additional capital and was working on reinstating access to the Federal Reserve Bank[29]—but OCIF placed the bank into liquidation before that process could be completed.

105.     Niembro and Ramírez firmly believed that these issues would be resolved. In fact, in December of 2022 Niembro injected 2,000,000 dollars of his own funds into the Bank and in January of 2023 he injected another 2,000,000 dollars—***plainly not the conduct of someone trying to strip the Bank of its liquidity***.

106.     Further, the specific acts that Zequiera and OCIF allege to support their false claim that Niembro and Ramírez were stripping the Bank of its liquidity simply make no sense. First, OCIF alleges that "Nodus, released Nodus Finance from a ***liquid debt*** of $25,738,875.65 that could have been used for the benefit of Nodus' depositors, in exchange for a late and delinquent loan portfolio and with an administration fee for the collection of those same loans." Order at 3 (emphasis added).

107.     But that debt was not "liquid," and it could not have been used to pay off the Bank's depositors. Nodus Finance borrowed money from the Bank in exchange for giving the Bank notes, then lent that money to borrowers on terms that corresponded to those of the notes it

---

[29] This time, the Bank sought online access the Federal Reserve Bank of New York's online bank transfer system, which did not have the capacity limitations of the manual system.

had given the Bank. In other words, notes with variable due dates were exchanged for notes with the same variable due dates. This exchange had no impact on the Bank's liquidity.

108.    Further, this exchange was done pursuant to OCIF's instruction to the Bank to reduce its exposure to Nodus Finance.  On May 5, 2023, OCIF fined the Bank $257,700 for purportedly having too high of a loan concentration with Nodus Finance. In response, the Bank paid the fine and exchanged Nodus Finance notes that it held with notes from other borrowers.

109.    OCIF also alleges that Niembro and Ramírez, improperly "using their positions as directors in both entities, reduced Nodus Finance's balance of funds deposited with Nodus from $986,313.83 to $25.28, thus wiping out virtually all of the funds in Nodus Finance's account . . . ." Order at 3.

110.    It is fundamentally fatal to OCIF's slanderous character assassination that this transaction occurred *after Driven was appointed* the Bank's administrator (and Niembro and Ramírez were no longer in control of the Bank). Further, it occurred pursuant to Driven's own procedure, whereby Bank customers were permitted to transfer funds between accounts in the Bank. All the funds "drawn down" from Nodus Finance's account were transferred to other accounts at the Bank, and none of those accounts were associated with either Niembro or Ramírez.

111.    Apparently grasping at straws, OCIF cites one shareholder disbursement of $25,000 to Niembro and Ramírez as the Bank's two shareholders, which was made pursuant to terms of a prospectus that existed before they invested in the Bank. It also was made before the Bank was jawboned into accepting OCIF's liquidation plan (and is dwarfed by Niembro's $4,000,000 liquidity infusion).

112.    Finally, OCIF alleges that Niembro received "the amount of $100,000.00 of 'fees' [in an] unjustified manner and in total disregard of depositors." Order at 4. Those fees were approved by Driven, ***the administrator that OCIF appointed*** and as demonstrated in section E, *supra*, Niembro worked diligently to repay the Bank's depositors. It was OCIF that frustrated his efforts.

113.    In fact, Niembro reached out to many of the Bank's borrowers to persuade and cajole them to pay what they owed. He also flew to Panama with the head of Driven to ensure that Driven had access to the Bank's accounts at Atlas Bank, which contained $4,800,000 in liquid funds.  Demonstrating another aspect of OCIF's planned destruction of the Bank, Driven delayed in transferring those funds to the Bank, and two months later Atlas Bank was placed in liquidation and those funds were frozen.

114.    None of this mattered to Zequeira, who went on a press tour defaming Niembro and Ramírez.[30] Zequeira even issued a press release to ensure that the media was aware of her Order and OCIF's unlawful conduct.[31]

115.    Zequeira's defamation and the actions that she took to frustrate Niembro's and Ramírez's attempts to repay the Bank's depositors has caused great personal and reputational harm to Niembro, Ramírez, and their respective families.

---

[30] Efraín Montalbán Ríos, *Owners of Nodus Bank Must Return Nearly $27 Million*, THE NEW DAY (Apr. 5, 2024), *https://www-pressreader-com.translate.goog/puerto-rico/el-nuevo-dia1/20240405/281801403983047?_x_tr_sl=es&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=wapp* ("These shareholders who were responsible for defrauding the depositors and creditors of Nodus and causing the insolvency of the EBI will not be able to hide behind the corporate entity.").
[31] OFFICE OF THE COMMISIONER OF FINANCIAL INSTITUTIONS, PRESS RELEASE: COMMISSIONER OF FINANCIAL INSTITUTIONS ISSUES COMPLAINT AND ORDER AGAINST NODUS INTERNATIONAL BANK SHAREHOLDERS (Apr. 4, 2014), *https://docs.pr.gov/files/OCIF/AVISOS-PUBLICOS/COMMISSIONER%20OF%20FINANCIAL%20INSTITUTIONS%20ISSUES%20COMPLAINT%20AND%20ORDER%20AGAINST%20NODUS%20INTERNATIONAL%20BANK%20SHAREHOLDERS.pdf*.

116.     In fact, there is a website dedicated to attacking Niembro, Ramírez, and their respective families.[32] The website contains a headline that "the families" of "Niembro and Ramírez have stolen more than $1,350,000." Mugshots and names of Niembro, Ramírez and their respective family members (including their wives, brothers, cousins, daughters, and significant others), are displayed below the headline.

117.     Niembro  suffers ongoing harm every day that OCIF is permitted to continue its unlawful, ultra vires misconduct.

<u>COUNT I</u>

<u>DEFENDANTS' UNLAWFUL, ULTRA VIRES CONDUCT</u>
<u>RENDERS THE ORDER VOID AB INITIO</u>

118.     Plaintiff realleges and incorporate paragraphs 1-117 above as though fully set forth here.

119.     OCIF is an administrative entity created by Puerto Rico's legislature in 1985. OCIF derives its authority from the *Office of the Commissioner of Financial Institutions Act*, Law No. 4 of October 11, 1985 ("Act No. 4-1985"), and its power to regulate international banks from the *International Banking Center Regulatory Act*, Law No 52 of August 11, 1989 ("Act No. 52"). Both Acts contain a section entitled "Penalties," which states in clear and exclusive terms the penalties that OCIF is authorized to impose.

120.     Defendants acted ultra vires when they issued their Order declaring that "[t]he corporate veil of Nodus International Bank, Inc. is lifted." Order at 33. Nowhere do the Acts authorize defendants to pierce a bank's corporate veil and make its shareholders personally liable for the bank's debts, which renders the Order unlawful, ultra vires and void ab initio.

---

[32] Victimas del Nodus Bank (@victimasdelnodusbank1), INSTAGRAM (last visited May 22, 2024), *https://www.instagram.com/victimasdelnodusbank1/*.

121.    Defendants acted ultra vires when they issued their Order prohibiting Niembro "from doing business in the financial industry in Puerto Rico, directly or indirectly, for a period of ten (10) years." *Id.* This penalty cannot be found in the "Penalties" section of the Acts and does not exist, which renders this part of the Order unlawful, ultra vires and void ab initio.

122.    Defendants acted ultra vires when they issued their Order demanding that Niembro "personally and severally restitute the sum of not less than $26,825,189.48." *Id.* Act No. 52-1989 only permits OCIF to "impose restitution or reimbursement of ***those payments received*** in contravention of the provisions of this Act or any rule or regulation." Exhibit B, section 20(e)(2) (emphasis added). There were no such payments, which renders this part of the Order unlawful, ultra vires, and void ab initio.

123.    Defendants' Order is unlawful, ultra vires and void ab initio because it was issued in blatant contravention of (1) Act No. 4-1985, which established OCIF, and charged it, inter alia, with ensuring "that the interests of . . . shareholders . . . are protected," Exhibit G, Statement of Motives, and (2) the express legislative intent of Act No. 52-1989, "to expand the potential market for Puerto Rico's international banking center," Exhibit B, Statement of Motives.

124.    Defendants' issuance of the Order was an unlawful, ultra vires act that renders it void ab initio because its purported provisions, proscriptions and penalties vastly exceed defendants' enumerated, express or implied powers under the Acts.

125.     In issuing their unlawful, ultra vires order, defendants vastly exceeded not only what the Acts allow them to do, but what is reasonably necessary to carry out the legislature's intended goals for OCIF.

126.    Plaintiff has suffered and will continue to suffer immediate and irreparable harm as a result of defendants' unlawful, ultra vires "enforcement" action and the issuance of

defendants' unlawful, ultra vires Order, including the loss of nearly $27,000,000 in personal funds, liability for more than $86,000,000 of the Bank's debts, loss of his right to work in the Puerto Rico financial industry, and harm to their reputations and standing in the community.

127.    As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered actual damages in excess of $75,000.

<u>COUNT II</u>

<u>CLAIM UNDER 42 U.S.C. § 1983 FOR DEFENDANTS' VIOLATION OF THE
FOURTEENTH AMENDMENT GUARANTEE OF EQUAL PROTECTION</u>

128.    Plaintiff realleges and incorporate paragraphs 1-117 above as though fully set forth here.

129.    42 U.S.C. § 1983 provides a private cause of action with respect to the violation of federal constitutional rights. The Act provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2012).

130.    The aim of Section 1983 is to deter state actors from using their badges of authority to deprive individuals of federally guaranteed rights, and to provide relief to victims if such deterrence fails.

131.    The Fourteenth Amendment's Equal Protection Clause prohibits a state from treating similarly situated persons differently because of their classification in a particular group.

132.    Plaintiff was born in Venezuela, is of Venezuelan national origin, and continues to reside in Venezuela.

133.    Defendants discriminated against plaintiff and treated him unfavorably based on his not being from Puerto Rico and his Venezuelan national origin.

134.    First, defendants never have sought to impose the Order's extreme, unprecedented liabilities and penalties on local Puerto Rico banks or their shareholders. Defendants' unlawful conduct, from which this action arises, targeted plaintiff as a non-Puerto Rico person of Venezuelan origin.

135.    Second, defendants have demonstrated a discriminatory animus toward Venezuelan and non-Puerto Rico banks and bankers.

136.    Third, defendants have engaged in a campaign to suppress and close banks owned by Venezuelans and other non-Puerto Rico persons, while simultaneously promoting and expanding local Puerto Rico banks, including granting a new banking license to Nave Bank in August 2023, whose Business Development Officer is Zequeira's husband.

137.    There exists no rational basis, let alone *compelling* state interest to justify this disparate treatment based on national origin, defendants' acts were not *narrowly tailored* to promote a compelling state interest, and defendants' act were not the *least restrictive* means to accomplish their desired objective.

138.    Defendants, acting under color of law, unlawfully imposed extreme, confiscatory liability on plaintiff based on plaintiff's national origin, which violated his constitutional right to equal protection.

139.    As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered actual damages in excess of $75,000.

## COUNT III

### CLAIM UNDER 42 U.S.C. § 1983 FOR DEFENDANTS' VIOLATION OF THE FOURTEENTH AMENDMENT GUARANTEE OF PROCEDURAL DUE PROCESS

140.   Plaintiff realleges and incorporate paragraphs 1-117 above as though fully set forth here.

141.   42 U.S.C. § 1983 provides a private cause of action for the violation of federal constitutional rights. The Act provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2012).

142.   The aim of Section 1983 is to deter state actors from using their badges of authority to deprive individuals of federally guaranteed rights, and to provide relief to victims if such deterrence fails.

143.   The Fourteenth Amendment's Due Process Clause prohibits defendants from depriving plaintiff of his property interests without providing due process of law.

144.   Defendants, acting under color of state law, deprived plaintiff of significant property interests in (1) his right to work in the financial industry in Puerto Rico, (2) his personal funds, and (3) his right to the protections of corporate law as a shareholder of the Bank.

145.   The procedures that defendants employed to deprive plaintiff of his property interests were constitutionally deficient because plaintiff was not provided fair notice of the deprivation or any pre-deprivation hearing, let alone one that passed constitutional muster.

146.    Upon issuance of the Order, defendants immediately and unlawfully deprived plaintiff of his significant property interests in his personal funds, his right to work in the financial industry in Puerto Rico, and his right to the protections of corporate law as a shareholder of the Bank.

147.    The procedures that defendants employed to deprive plaintiff of his property interests also were constitutionally deficient, because the regulations that govern OCIF's administrative proceedings were drafted to facilitate a speedy adjudication process that is proportional to the limited penalties OCIF may levy after notice and a hearing, not the draconian penalties defendants purported to impose after confiscating plaintiff's property and right to work.

148.    The procedures defendants employed here were unlawfully insufficient in view of the magnitude of property interests at stake, and deprived plaintiff of the level of procedural due process required and guaranteed by the Fourteenth Amendment.

149.    Further, the catchall language in Act No. 52-1989, Section 20(e)(2), that the Commissioner may impose a "remedy as she or he deems necessary to enforce the purposes of this Act" is unconstitutionally vague and it does not provide plaintiff with notice as to what potential penalty may be imposed by OCIF.

150.    It certainly did not provide plaintiff with notice that OCIF would Order (1) purported "restitution" of $26,825,189 (monies plaintiff never received), as well as (2) personal exposure for approximately $86,000,000 in Bank liabilities, and (3) a ban on doing business in Puerto Rico's financial industry for ten years.

151.    This is especially true considering that the maximum fine permitted by Act No. 52-1989 (20)(e)(1) is $25,000. The total value of these fines, penalties and disabilities exceeds $112,000,000, which is 4,480 times larger than the maximum statutory fine.

152.    As a direct and proximate result of defendants' unlawful conduct, plaintiff has suffered actual damages in excess of $75,000.

## COUNT IV

### CLAIM UNDER 42 U.S.C. § 1983 FOR DEFENDANTS' VIOLATION OF THE FOURTEENTH AMENDMENT GUARANTEE OF SUBSTANTIVE DUE PROCESS

153.    Plaintiff realleges and incorporate paragraphs 1-117 above as though fully set forth herein.

154.    42 U.S.C § 1983 provides a private cause of action with respect to the violation of federal constitutional rights. The Act provides in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the part injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

42 U.S.C. § 1983

155.    The aim of Section 1983 is to deter state actors from using their badges of authority to deprive individuals of federally guaranteed rights, and to provide relief to victims if such deterrence fails.

156.    The Fourteenth Amendment's Due Process Clause prohibits defendants from depriving plaintiff of his property interests in a manner that shocks the conscience.

157.    Defendants, acting under color of law, summarily deprived plaintiff of his property interests in (1) his right to work in the financial industry in Puerto Rico, (2) his personal funds, and (3) his right to the protections of corporate law as shareholders of the Bank.

35

158.    Defendants also have slandered plaintiff by falsely and publicly claiming that he stole money from Bank depositors (who are primarily Venezuelan), which endangers plaintiff's life, as a Venezuelan resident.

159.    Defendants have also severely harmed plaintiff's reputation and have caused his family to be the target of attacks and online harassment.

160.    Defendants discriminatorily targeted plaintiff by placing the Bank into liquidation and issuing the Order. In contrast, Zequeira has promoted local Puerto Rico banks, such as Nave Bank, whose Business Development Officer is Zequeira's husband.

161.    Defendants appointed Driven as administrator of the Liquidation Plan, despite Driven's lack of experience and the availability of more experienced, less expensive options.

162.    Defendants summarily rejected all three of plaintiff's efforts to liquidate the Bank, collect money from debtors, and repay money to depositors.

163.    Under Driven's and OCIF's direction, key bank personnel left the Bank and borrowers stopped repaying loans. As a result, the Bank's depositors remain unpaid.

164.    OCIF issued its Order with no warning, giving no opportunity for plaintiff to be heard or present a defense. The Order purports to (1) pierce the Bank's corporate veil and (2) make plaintiff personally liable for the Bank's debts (more than $86,000,000), (3) impose on plaintiff more than $26,000,000 in personal restitution and $50,000 in fines, and (4) ban plaintiff from working in Puerto Rico's financial industry for ten years.

165.    Those purported fines, penalties and disabilities are grossly disproportionate to the maximum statutory fine of $25,000.

166.    The Order blames and scapegoats plaintiff for OCIF's own misconduct, and contains and relies on demonstrably false statements. One example is the Order's claim that

plaintiff stripped the Bank of its liquidity, when in fact, Niembro contributed more than $4,000,000 of his personal funds to increase the Bank's liquidity.

167.    OCIF has widely distributed and repeated its Order's false narrative in the media, while acknowledging that the Order is "extraordinary."

168.    As demonstrated above, the Order also is ultra vires and void ab initio, because it exceeds the scope of statutory authority granted to OCIF or Zequeira, which makes defendants' gross overreaching even more shocking.

169.    Defendants' misconduct is so egregiously improper and outrageous that it shocks the conscience.

170.    As a direct and proximate result of defendants' misconduct, plaintiff has suffered damages in excess of $75,000.

## <u>COUNT V</u>

### <u>CLAIM UNDER 42 U.S.C. § 1983 FOR DEFENDANTS' VIOLATION OF THE EIGHTH AMENDMENT'S PROHIBITION OF EXCESSIVE FINES</u>

171.    Plaintiff realleges and incorporate paragraphs 1-117 above as though fully set forth here.

172.    42 U.S.C § 1983 provides a private cause of action with respect to violations of federal constitutional rights. The Act provides in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the part injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

42 U.S.C. § 1983

173.    The aim of Section 1983 is to deter state actors from using their badges of authority to deprive individuals of federally guaranteed rights, and to provide relief to victims if such deterrence fails.

174.    The Eighth Amendment applies to the states through the Fourteenth Amendment.

175.    The Eighth Amendment provides that "[e]xcessive bail shall not be required, *no excessive fines imposed*, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII (emphasis added).

176.    The fines that OCIF and Zequeira purport to impose in the Order on plaintiff Niembro are plainly excessive and grossly disproportionate.

177.    The maximum fine permitted by Act No. 52-1989 (20)(e)(1) is $25,000, which the Order purports to impose, together with (1) purported "restitution" of $26,825,189 (monies plaintiff never received), as well as (2) personal exposure for approximately $86,000,000 in Bank liabilities, and (3) a ban on doing business in Puerto Rico's financial industry for ten years.

178.    The total value of these fines, penalties and disabilities exceeds $112,000,000, which is 4,480 times larger than the maximum statutory fine of $25,000. The purported ten-year ban on doing business in Perto Rico's financial industry has an incalculable value that alone dwarfs the value of the maximum fine under the Act.

179.    The gross excessiveness of these purported fines, penalties and disabilities is not cured by the catchall provision of Act No. 52-1989, Section 20(e)(2), which permits the Commissioner to impose a "remedy as she or he deems necessary to enforce the purposes of this Act." Whatever discretion Zequeira had was grossly abused by the Order's excessive and disproportionate fines, penalties, and disabilities, which are at least 4,480 times greater than the statutory maximum.

180.    The fines, penalties and disabilities that the Order purports to impose are objectively excessive and disproportionate to the purported wrongdoing, as well as to the fines permitted by the Acts.

181.    As demonstrated in section G(3), *supra*, Niembro is alleged to have (1) followed defendants' instructions to reduce the Bank's exposure with Nodus Finance, (2) made transfers between accounts at the Bank in accordance with the procedures of Driven, defendants' required administrator, (3) approved a shareholder disbursement in accordance with the Bank's prospectus before entering into liquidation at defendants' urging, and (4) received a salary for the work he performed. None of that merits fines and penalties of more than $11,000,000 and the disability of a ten-year ban on doing business in Puerto Rico's financial industry.

182.    As a direct and proximate result of defendants' misconduct, plaintiff has suffered damages in excess of $75,000.

## PRAYER FOR RELIEF

For all these good and sufficient reasons, plaintiff demands the following relief:

(a)    A declaratory judgment that: (1) OCIF lacked authority to issue the Order, which is therefore ultra vires and void ab initio, (2) the Order violated plaintiff's Fourteenth Amendment right to equal protection, procedural and substantive due process, and is therefore unenforceable, (3) the Order violates the Eighth Amendment's prohibition on excessive fines and is therefore unenforceable, and that; (4) OCIF's administrative proceeding and any other efforts to enforce the unlawful Order should be dismissed;

(b)    A preliminary and permanent injunction enjoining defendants and all others acting on their behalf or in concert with them from enforcing the Order; and

(c)    An Order awarding plaintiff such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so triable.

RESPECTFULLY SUBMITED.

<u>I</u>n Guaynabo, Puerto Rico, this 24th day of May 24, 2024.


**RUIZ LAW OFFICES, PSC**
Pedro E. Ruiz Meléndez
P.O. Box 190879
San Juan, Puerto Rico 00919-0879
Telephone: (787) 622-6232
E-mail: pruiz@ruizlawoffices.com

By:     <u>*s/Pedro E. Ruiz Meléndez*</u>
        Pedro E. Ruiz Meléndez
        USDC-PR-No. 208311

**RIVERO MESTRE LLP**
2525 Ponce de León Blvd.,
Suite 1000
Coral Gables, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: zkass@riveromestre.com
E-mail: bjosephs@riveromestre.com

By:     <u>*/s/ Andrés Rivero*</u>
        ANDRÉS RIVERO
        *(Pro Hac Vice Pending)*
        Florida Bar No. 613819
        *Pro Hac Vice pending*
        ALAN H. ROLNICK
        Florida Bar No. 715085
        *(Pro Hac Vice Pending)*
        ZALMAN KASS
        Florida Bar No. 100554
        *(Pro Hac Vice Pending)*
        BRIANA JOSEPHS
        Florida Bar No. 1044192
        *(Pro Hac Vice Pending)*